**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **JULIANNA "JILL" BRANNEN,** *as Trustee of the 1996 C. Bishop Brannen III Irrevocable Trust***; CLINTON B. BRANNEN, IV; and SARAH-AVERILL BRANNEN,** | |
| *Plaintiffs,* | **CIVIL ACTION NO. 5:18-cv-00044-TES** |
| **v.** | |
| **JACKSON NATIONAL LIFE INSURANCE COMPANY,** | |
| *Defendant.* | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Bishop Brannen died three years ago. Prior to his death, Bishop took out a 20-year term life insurance policy, but he missed his last payment, causing the policy to lapse. Under operation of Georgia law and the Eleventh Circuit's interpretation of that law, Bishop's children will lose $2.3 million because of that missed payment.

In hopes to avoid this loss, Plaintiffs, who are his former spouse (Julianna) and his children (Clinton and Sarah-Averill), hired an attorney who sent a demand letter (along with the missed payment) to Defendant Jackson National Life Insurance Company demanding it pay the claim. Contending that the policy had lapsed and could not be reinstated due to Bishop's death, Jackson National denied the claim. After months of back and forth, Plaintiffs instituted this action against Jackson National,

asserting claims for breach of contract (Counts I, II), accord and satisfaction (Count III), estoppel (Count IV), other equitable relief (Count V), bad faith damages pursuant to O.C.G.A. § 33-4-6 (Count VI), and attorney's fees. [Doc. 16 at pp. 12–21].

Early in the case, Jackson National moved the Court to dismiss Plaintiffs' estoppel (Count IV) claim. After conferring with defense counsel and researching relevant Georgia law, Plaintiffs consented to the dismissal and the Court granted the motion. [Docs. 18, 27, 29].[1] Plaintiffs, however, opposed dismissal of their "other equitable relief" claim (Count V), taking the position that the Georgia Court of Appeals incorrectly interpreted O.C.G.A. § 33-24-44(d) in *Guideone Life Insurance Co. v. Ward*, 619

---

[1] Too often, bad lawyering gives judges the opportunity to criticize and complain about needless claims and meritless positions that lesser lawyers stubbornly cling to, even when they know they will fail. And courts are right to do so when warranted. However, notwithstanding countless efforts and exhortations to lawyers to be more professional, courts (including this judge) routinely fail to highlight and praise exceptional professionalism when we see it. Today, the Court takes the opportunity to publicly brag about what it considers a superior example of professionalism and to encourage others to take note and emulate these fine lawyers.

As any reader will soon see, this is a tough, emotional, and hard-fought case. It involves events that could lead to understandably raw emotions. Its record is dense and the facts are detailed and intricate. The parties to this case, and the Court, are blessed with lawyers who have zealously represented their clients, swinging hard, but always fairly. During the Court's oral argument, and throughout the case, both sets of lawyers conducted themselves with the utmost sense of professionalism. The Court is thankful and honored to have had them in this case.

The Court would like to call special attention to an act of professionalism that the Court sees all too rarely. After Plaintiffs filed their Amended Complaint [Doc. 16], Jackson National moved to dismiss Count IV because it believed that the current state of Georgia law would not allow it to stand. Plaintiffs' counsel talked to defense counsel, researched the law, and agreed that he was right. He then told the Court that his opponent was correct and consented to dismissal for that count. He did what good lawyers do—admit the other side is right and concede the point without needless wasted time that would only engender ill will and animosity. He did not belabor the point or torture some facts to try to save the doomed claim. He simply agreed with his adversary. The Court knows it is never easy to concede that a claim cannot stand under the current state of the law. But, as lawyers, we are required to do just that. There is no shame in such a gracious act, only honor. What a refreshing act of professionalism. Well done.

S.E.2d 723 (Ga. Ct. App. 2005), and its predecessor *Goodley v. Fireman's Fund American Life Insurance Co.*, 326 S.E.2d 7 (Ga. Ct. App. 1985). [Doc. 27 at p. 6]; *see also* [Doc. 16 at p. 17]. Nevertheless, Plaintiffs astutely recognized that Count V fails under the current interpretation and, after preserving their appellate rights on that claim, consented to its dismissal. [Doc. 27 at p. 6]. Jackson National has now moved for summary judgment adjudication on the four remaining claims—a claim for bad faith damages couched on two breach of contract claims and an accord and satisfaction claim. After a careful review of the record, the parties' briefs, and with the benefit of oral argument, the Court **GRANTS** Jackson National Insurance Company's Motion for Summary Judgment [Doc. 47].

## I.  FACTUAL BACKGROUND

Julianna, as trustee of the 1996 C. Bishop Brannen III Irrevocable Trust (the "Trust"), and the Trust's beneficiaries, Clinton and Sarah-Averill (collectively "Plaintiffs"), filed this lawsuit seeking to recover proceeds of a life insurance policy insuring the life of the late Clinton Bishop Brannen, III. [Doc. 16 at ¶ 1].

### A.  The Policy

On June 4, 1997, Valley Forge Life Insurance Company[2] issued a life insurance policy (the "Policy") to Clinton Bishop Brannen, III (the "Insured" or "Bishop") with a

---

[2] The original insurer of the Policy, Valley Forge Life Insurance Company, changed its name to Reassure America Life Insurance Company ("REALIC"), and Jackson National acquired the Policy from REALIC in 2013. [Doc. 62-1 at ¶¶ 2–3].

fixed annual premium payment of no more than $2,547.20 due each subsequent year for 20 years. [Doc. 62-1 at ¶¶ 1, 4–6]. Bishop paid the annual premium for the first 19 years of the policy term, but he failed to pay his final payment, which had come due on June 4, 2016. [*Id.* at ¶¶ 8, 30].

In the event that "[a]ny premium, other than the first, . . . [wa]s not paid by its [due date]," the Policy provided a 31-day Grace Period during which the Policy would stay in force. [*Id.* at ¶¶ 9–10]; [Doc. 18-1 at p. 17]. At any time during that 31-day period, a missed premium could be paid if "the Insured [was] living" at the time of the payment. [Doc. 62-1 at ¶ 11]; [Doc. 18-1 at p. 17]. If, however, an annual premium remained unpaid at the end of the Grace Period, the Policy could be reinstated up to five years after it lapsed under certain circumstances, provided that Bishop was alive at the time of payment. [Doc. 62-1 at ¶¶ 12–13]; [Doc. 18-1 at p. 17].

B.    **The Trust**

The Trust was the sole beneficiary of the Policy, and Bishop's now adult children are the sole and equal beneficiaries of the Trust. [Doc. 16-2 at ¶¶ 15–16]. Julianna was the initial trustee under the terms of the Trust; however, its terms provided that

> [i]n the event the [Insured] and [Julianna] become divorced, she shall cease to be a beneficiary and fiduciary under this Agreement (and shall be treated for the purposes of this Agreement as if she had predeceased the [Insured]) . . . and she shall have no right to exercise any power under this Agreement granted to her.

[*Id.* at ¶¶ 17–18]; [Doc. 55-1 at p. 24]. After she and Bishop divorced in May 2007, her role as trustee ceased in accordance with the Trust's terms, and Clinton and Sarah-Averill's godparent, Brack Maggard, became successor trustee in July 2007. [Doc. 62-1 at ¶¶ 19–21]. The terms of the final order for their divorce required Bishop to maintain a life insurance policy "with no less than $1,000,000.00 of death benefit, naming the two minor children of the parties as equal beneficiaries until such time as they reached the age of majority and are no longer eligible for child support." [*Id.* at ¶ 23]; [Doc. 49-12 at p. 155]. When Clinton and Sarah-Averill graduated from high school in 2011 and 2016, respectively, Bishop no longer had to pay child support. [Doc. 49-12 at pp. 153–54]. And, because he no longer had to pay child support, he no longer had to continue to pay for the Policy. [Doc. 62-1 at ¶¶ 24–27, 29]; [Doc. 49-12 at pp. 153–54].

### C.   <u>Lapse of the Policy in 2016</u>

Although Bishop didn't pay the June 4, 2016, premium payment, in accordance with the Policy's provisions, the Policy nonetheless remained in force for 31-days (the Grace Period), which ended on July 5, 2016. [*Id.* at ¶¶ 30, 32]. After the Policy officially lapsed, Jackson National sent a Notice of Lapse dated July 12, 2016, which stated, "Your [P]olicy provided a Grace Period following your premium Due Date of June 04, 2016, during which premiums could be paid without affecting your coverage. Since your premium payment has not been received your [P]olicy has terminated without value effective July 05, 2016 . . . ." [*Id.* at ¶ 34]; [Doc. 55-1 at p. 30].

The Notice of Lapse also outlined the criteria for reinstatement of the Policy. Any reinstatement, however, was subject to the requirement that "[t]he Insured [was] living on the date that all past due premiums are received" by Jackson National. [Doc. 62-1 at ¶ 35]; [Doc. 55-1 at p. 30]. Relevant to these reinstatement provisions, the Notice of Lapse also provided that, "[i]f the [p]olicy is not reinstated under the . . . conditions [listed in the Notice of Lapse], the [P]olicy [would] remain lapsed." [Doc. 62-1 at ¶ 36]; [Doc. 55-1 at p. 30]. Almost a month after Jackson National sent the Notice of Lapse, it sent a subsequent notice informing the Insured that "the time ha[d] ended for reinstating" the Policy under the 20-day reinstatement period following the Grace Period. [Doc. 62-1 at ¶ 37]; [Doc. 55-1 at p. 31]; [Doc. 18-1 at p. 17].

### D. **The Insured's Death**

Bishop died on July 24, 2016, and nearly two months later, Maggard became the executor of the Insured's estate. [Doc. 62-1 at ¶¶ 39–40]. In order to resolve disputes over the distribution of the estate, Bishop's adult children and his widow (Tracy Brannen) proceeded to mediation. [*Id.* at ¶ 41]. Following the mediation, Clinton, Sarah-Averill, and Tracy executed a settlement agreement, and as part of that agreement, released Maggard from his responsibilities as trustee and executor of the estate. [*Id.* at ¶¶ 42–43]. The Trust provided for two successor appointments. [*Id.* at ¶ 44]. However, Plaintiffs' prior counsel secured renunciations from the two trustees named to succeed

Maggard. On October 10, 2017, the Superior Court of Houston County, Georgia, issued an order appointing Julianna as trustee. [*Id*. at ¶¶ 45–46].

### E.   Jackson National's Denial of Plaintiffs' Claim for Policy Proceeds

On March 14, 2017—seven months before the trustee appointment from the Houston County Superior Court—Julianna's prior counsel sent a letter to Jackson National in Lansing, Michigan, accompanied by a completed "Life Insurance Claim Form" seeking the proceeds of the Policy. [*Id*. at ¶¶ 60–61].[3] The two-page letter enclosed several documents: the required claim form, an affidavit from Maggard, a copy of the Trust and modification documents, various correspondence from Jackson National, a death certificate, and a check for $2,922.80 drawn on Plaintiffs' prior counsel's trust account.[4] [*Id*. at ¶ 62–63]; *see generally* [Doc. 55-1].

Jackson National received this letter and its enclosures on March 15, 2017, at its corporate headquarters in Lansing, Michigan. [Doc. 62-1 at ¶ 64]. Jackson National's mailroom scanned the letter and its contents and sent those scanned documents to be indexed and routed to the proper departments. [*Id.* at ¶ 65]. This Order focuses on what

---

[3] The parties dispute Julianna's status as trustee at the time her prior counsel sent the letter, because she had not yet been appointed trustee. *See* [Doc. 47-1 at pp. 7–8 ("Julianna Brannen falsely represented herself as the 'trustee' of the Trust, and in a letter from her [prior] counsel, submitted a life insurance claim form to Jackson seeking full payment of the Policy's proceeds . . . .")].

[4] Although the letter states that the enclosed check "represent[ed] payment in full of the outstanding premium that was due at the time of [the Insured's] death[,]" Plaintiffs make clear that "additional consideration was . . . offered by Plaintiffs in exchange for reinstat[ment] of the [P]olicy." [Doc. 55-1 at p. 2]; [Doc. 62-1 at ¶ 62].

happened next. Although it is unknown who reviewed the check and the enclosures, we do know that it went to some department for review and was eventually deposited on March 22, 2017. [*Id.* at ¶ 75]. Five days later, some unknown person, upon realizing that the Policy had lapsed and that the Insured had died, decided that Jackson National would not reinstate the Policy and that Plaintiffs' outstanding premium payment should be refunded.[5] [*Id.* at ¶ 76]. These circumstances pit an interesting question to the Court: whether the five-day period between Jackson National knowingly depositing the check (after reviewing a completely forthcoming and undeniably candid letter detailing the lapse and the Insured's death) and refunding it constitutes a retention such that Jackson National is on the hook for $2.3 million. The short, but unfortunate, answer (for Plaintiffs) is no.

## II.   DISCUSSION

### A.   Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on

---

[5] Following Jackson National's "deposit" of Plaintiffs' check, Plaintiffs dispute that their check was actually refunded, because they chose not to deposit it within its 180-day validity period. *See, e.g.*, [*id.* at ¶ 79]; *see also* [Doc. 55-20 at p. 1 ("VOID AFTER 180 DAYS")]. Regardless of whether the funds were—as a legal term of art—"returned" or "refunded," it is undisputed that Jackson National attempted to return the amount paid. Plaintiffs' prior counsel has placed Jackson National's check in his safe deposit box for preservation, and Jackson National has since deposited the same amount ($2,922.80) into the Court's registry. [*Id.* at ¶¶ 78–79]; *see also* [Docs. 13–14].

the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[6] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437–38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may show—that is, point out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings."

---

[6] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing

*Celotex Corp.*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the

rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed

fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). Further, where a party fails to address

another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may

consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).

However, "credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*,

477 U.S. at 255. Stated differently, "the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." *Id.* at 249. "The evidence of the [nonmovant] is to be believed,

and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

B. **Plaintiffs' Breach of Contract Claims (Counts I and II)**

In their first breach of contract claim, Plaintiffs contend that Jackson National is

in breach because it refuses to pay the full proceeds of the Policy after it "waived

compliance" with its terms "by cashing [their] check with full knowledge . . . that

Bishop . . . had already died." [Doc. 16 at ¶ 45]. Jackson National, on the other hand,

argues that it is entitled to summary judgment on this claim because its prompt return

of Plaintiffs' payment precludes a waiver under Georgia law. [Doc. 47-1 at p. 10]. To

combat Jackson National's stance that its return of Plaintiffs' funds was reasonable

under current precedent, Plaintiffs devote the vast majority of their argument to Jackson National's internal policies and procedures.

Mainly, Plaintiffs take the position that Jackson National's affirmative decision to endorse and deposit their check, "after three in-house employees," scattered among different departments, reviewed each document enclosed with their initial letter creates a triable issue as to "retention" and renders summary judgment inappropriate. [Doc. 62 at p. 13]. The record before the Court is saturated with evidence as to Jackson National's business practices or "workflow" regarding Plaintiffs' initial letter and the attached check and Jackson National's multi-department review—the Document Control Center, Indexing, and New Business—of those documents. [*Id.* at pp. 8–9]. Accordingly, as Plaintiffs submit, "the evidence strongly suggests that Jackson [National] reviewed [Plaintiffs' initial letter] with the check at least three times before endorsing, depositing it, and withdrawing the funds." [*Id.* at p. 9]. It is through this lens that Plaintiffs contend that "[a] jury should decide whether Jackson National's review of [Plaintiffs' initial letter] and death certificate and decision to cash the check was a retention under the circumstances." [*Id.* at p. 15].

Even drawing all justifiable inferences in Plaintiffs' favor—that Jackson National, because of its internal policies and procedures, "received and accepted the past due premium check" with "full knowledge of the facts"—Jackson National is still entitled to summary judgment because, quite frankly, Plaintiffs had no right to reinstate the Policy.

[Doc. 62 at pp. 12–13]. The Policy clearly states that reinstatement is only possible "while the Insured is alive." [Doc. 18-1 at p. 17].[7] Nevertheless, even without this provision, Jackson National's acceptance of Plaintiffs' check did not amount to a retention sufficient to constitute a waiver reinstating the Policy.

Under prevailing Georgia case law, a waiver of lapse occurs "where a policy is forfeited because of [non-payment] of premiums when due, and subsequently the insured sends in the amount due, which is retained by the company without objection . . . ." *Union Cent. Life Ins. v. Merrell*, 184 S.E. 655, 657 (Ga. Ct. App. 1936) (citing *Ga. Masonic Mut. Life Ins. v. Gibson*, 52 Ga. 640 (1874)). "If an insurance company receives, accepts, and retains past-due premiums which are paid subsequent to the due date and expiration of the grace period, it renews the contract and waives the forfeiture for non-payments . . . ." *Rutland v. State Farm Mut. Auto. Ins.*, 426 F. App'x 771, 774 (11th Cir. 2011) (quoting *Clark v. United Ins. Co. of Am.*, 404 S.E.2d 149, 152 (Ga. Ct. App. 1991)). As Jackson National correctly argues, there is no waiver of an insurance policy's terms

---

[7] The Policy states verbatim:

> **REINSTATEMENT** – This policy may be reinstated *while the Insured is alive* within 20 days after the end of the Grace Period by payment of the unpaid premium. We will not require evidence of insurability. Reinstatement does not extend the Grace Period.
>
> This policy may also be reinstated following the 20 day period after the end of the Grace Period. Such reinstatement must be made *while the Insured is living* and within 5 years after the Premium Due Date of the unpaid premium.

[Doc. 18-1 at p. 17 (emphasis added)].

when the insurance company promptly returns the past-due premium. [Doc. 47-1 at p. 11]. To support that argument, Jackson National rests on *Rutland*, an unreported, and therefore non-binding, Eleventh Circuit case. The *Rutland* court ultimately held that "six weeks was not unreasonably long" for an insurance company to determine whether an insured's payment was improperly tendered. 426 F. App'x at 774.

To be certain, the Plaintiffs cannot reasonably dispute that Jackson National "prepared a refund"[8] of Plaintiffs' late premium payment within 12 days of receiving the payment and within five days of depositing the check.[9] [Doc. 62-2 at ¶¶ 75–76]. Under *Rutland*, logic dictates that if a six-week period to determine whether a premium was properly tendered is reasonable, then Jackson National's 12-day period used to make an identical determination must also be reasonable. This case, as Jackson National argues, is just like *Rutland*.

However, *Rutland* not only applies here because of its determination that six weeks "was not unreasonably long," it also applies because of the seemingly identical

---

[8] Again, Plaintiffs do dispute that Jackson National actually "refunded" the $2,922.80. *See, e.g.*, [Doc. 62-1 at ¶ 76]; *see also* n.4, *supra*. Plaintiffs argue that Jackson National "tendered the check with a condition, and thereafter voided the check on September 23, 2017." [*Id.*]. Regardless of whether the check was "void" after six months, the funds in dispute in this case are currently in the Court's registry. *See* [Docs. 13–14].

[9] To reiterate, on March 15, 2017, Jackson National received Plaintiffs' initial letter and premium payment in Lansing, Michigan. [Doc. 62-1 at ¶ 64]. On March 22, 2017, Jackson National deposited Plaintiffs' premium payment, withdrawing funds from Plaintiffs' prior counsel's trust account. [*Id.* at ¶ 75]. On March 27, 2017, Jackson National's third-party administrator, Pankaj Kumar, an employee of DXC/Technology-Alliance One, working in Noida, India, prepared Plaintiffs' "refund." [*Id.* at ¶¶ 69, 76]; *see also* [Doc. 49-7, Kumar Depo., p. 43:6–7].

business practices used by two separate insurance companies. 426 F. App'x at 774. In *Rutland*, a State Farm agent told an insured that after she mailed in her past-due premium, "she would receive retroactive coverage for [her] car accident," but the agent did not have "the authority to provide retroactive coverage." *Id.* at 773–75. The Eleventh Circuit explained that "[t]he late payment [did] not necessarily demonstrate that [the insured] believed [the State Farm agent] had the authority to provide retroactive coverage; and even if [the insured] did sincerely believe so, such a belief cannot be said to be reasonable." *Id.* at 776. Thus, in *Rutland*, it was under State Farm's specific business practices that the Eleventh Circuit determined that the six-week retention period "was not unreasonably long because [it] needed to first determine that [the insured's] payment was improperly tendered." *Id.* at 774.

Here, Jackson National's internal operating procedures appear to be strikingly similar. Without completely rehashing the "elaborate tour" of Jackson National's mailroom, the journey of Plaintiffs' letter and check can be surmised in a few sentences. [Doc. 72 at p. 3]. It all starts with a "patch page" bearing a 2-D barcode. [Doc. 49-2, Cady Depo. (Vol. I), pp. 19–20].[10] After receiving Plaintiffs' letter and check from FedEx, a Jackson National employee in the Document Control Center (the mailroom) placed a patch page on top of Plaintiffs' documents. [*Id.* at pp. 16:5–23, 19:5—20:14]. That packet

---

[10] The Court's citations to all depositions refer to the page number assigned by the CM/ECF system rather than those printed on the parties' actual exhibits.

of papers was then run through a scanner that read the barcode, endorsed the check, determined into which bank account it should be deposited, and sent that batch of documents to a specific "work flow" within Jackson National, although the documents could later be reviewed and reassigned by an actual person at Indexing (the next step on the journey). [*Id.* at pp. 20:9–25, 22:17–25, 32:12—33:9]; [Doc. 59, Webster Depo., pp 8:5–8, 10:6–10]. After this step, Jackson National's procedures and testimony regarding who did what with Plaintiffs' letter and check is, to say the least, a little hazy.

Apparently, after Indexing, Erika Schoessel, an Operations employee in the Remittance Processing Department, on behalf of Vice President of Operations Michele Blinkley, sent the check with an explanatory letter to Jacksonville, Illinois, (supposedly another DXC administrative office) to be processed further.[11] [Doc. 49-1, Binkley Depo., p. 24:13–19]; [Doc. 49-6, Schoessel Depo., p. 6:12–13]. In 11 depositions from individuals associated with Jackson National in some way, shape, or form, no one is able to tell the Court exactly *who* made the decision to deposit Plaintiffs' check. But, following the business practices that the Eleventh Circuit previously accepted in *Rutland*, the question

---

[11] According to Erika Schoessel, "[t]he only purpose of sending [the check] out there to Jacksonville, Illinois[,] is because the [P]olicy was, essentially, supervised under another company." [Doc. 49-6, Schoessel Depo., at p. 32:2–5]. As previously stated, the original issuer of Plaintiffs' Policy was Valley Forge Life Insurance Company, which later changed its name to Reassure America Life Insurance Company ("REALIC"), located in Jacksonville, Illinois, and DXC administered the REALIC insurance contracts prior to Jackson National acquiring the contracts in 2013. [*Id.* at p. 33:4–15]; [Doc. 62-1 at ¶¶ 2, 70].

of who might have sent Plaintiffs' check for deposit—or failed stop it—is largely irrelevant.

For example, Jackson's Vice President of Operations, Michele Binkley, "absolutely" did not deposit the check, but someone in Data Management, an area under her responsibility, "would have reviewed" the correspondence that accompanied the check. [Doc. 49-1, Binkley Depo., pp. 17:16–18, 24:15—25:14]. According to Ms. Binkley, after the images of Plaintiffs' letter and check were scanned in the mailroom, "those images [came] to [her] department, . . . creating a bundle for deposit. [Then] there [was] a review of that deposit and the Remittance Processing processor initiate[d] . . . the electronic deposit." [*Id.* at p. 38:14–21]. Yet, Erika Schoessel, the only Remittance Processing[12] employee to deposed, testified that she "[r]ejected the check" in Jackson National's check processing system. [Doc. 49-6, Schoessel Depo., p. 22:23–25]. Miraculously, despite neither Ms. Binkley nor Ms. Schoessel depositing the check, funds were somehow withdrawn from Plaintiffs' prior counsel's trust account on March 22, 2017. [Doc. 49-9, Moorhead Depo., p. 98]; [Doc. 62-1 at ¶ 75].

Hoping to unravel Jackson National's business practices, the Court read the deposition testimony of Nate Maas, an in-house attorney for Jackson National. As with the other deponents, Mr. Maas also does not determine "whether to pay a claim or not

---

[12] Remittance Processing, according to Ms. Schoessel's deposition testimony "review[s] the checks that are received, and then if there is correspondence with it, [a remittance processor goes] through that correspondence, and . . . appl[ies] the funds." [Doc. 49-6, Schoessel Depo., at p. 20:23–25].

pay a claim." [Doc. 49-8, Maas Depo., p. 49:12–20]. Notwithstanding the many, many things Mr. Maas did not remember or did not know concerning this case during his deposition, he did know that he only makes recommendations. [*Id.* at pp. 16:1–8, 49:16–20, 50:10–20]; [Doc. 49-4, Hayes Depo., pp. 21:25—22:2]. Still uncertain as to Jackson National's business practices, the Court turned to Nancy Hayes' deposition. Ms. Hayes is a lead claims oversight administrator tasked with overseeing claims paid and reviewed by third-party administrators. [Doc. 49-4, Hayes Depo., p. 8:17–20]. One of her responsibilities "is to review life insurance claims . . . that the administrators pay for face amounts of [$]100,000 and more up to $760,000." [*Id.* at p. 9:18–20]. However, because the Policy in this case is over $760,000, Ms. Hayes could only "review [the Policy] preliminarily for upper management."[13] [*Id.* at pp. 9:23—10:3].

More than most other deponents, Ms. Hayes, one of Jackson National's Rule 30(b)(6) deponents, provided the greatest insight to what *might* have happened in this case. Consistent with the picture painted by Ms. Schoessel, Ms. Hayes testified that she understood that Plaintiffs' letter was referred from the mailroom to the DXC administrative office where it was reviewed by Janice Compton (now retired), then Ms. Compton subsequently referred it back to Jackson National's legal department for Nate Maas's review. [*Id.* at pp. 31:12–18; 44:24–25]. Specifically, Ms. Hayes's "understanding

---

[13] Notably, Ms. Hayes "[i]n the course of [her] work" has "never seen a post-death reinstatement or renewal provision in a policy." [Doc. 49-4, Hayes Depo., p. 41:18–20].

of the process is that the checks . . . get deposited, and *then* the information gets processed, matched up, [and a decision is made as to] what's happening with whatever the policy is. . . . Sometimes . . . a premium is received that is not due to [Jackson National] and [they] refund it." [*Id.* at pp. 69:22—70:2 (emphasis added)]. Succinctly put, in processing the "thousands of checks" that Jackson National receives, "they get processed, deposited, and the correspondence is subsequently reviewed by the appropriate department." [*Id.* at p. 88:15–18].

Significant to Jackson National's summary judgment motion, there is nothing in the record to suggest that anyone disputes Ms. Hayes's account of Jackson National's business procedures. In fact, Debra Kelley, an associate processor for DXC, a third-party administrator for Jackson National, testified that "all checks [DXC] receive[s] for Jackson National are deposited and then [Jackson National] determine[s] whether the policy is lapsed. And if [a policy] is lapsed or terminated, then [Jackson National] refund[s] the premium." [Doc. 49-5, Kelley Depo., pp. 8:22—9:9, 45:15–18]. Ms. Kelley further elaborated on the issue of terminated policies to say that if a "policy is terminated," then that policy is "somehow set aside, kicked out, . . . and reviewed by"—guess who—an unknown *someone* "to see if the payment should be applied to the policy." [*Id.* at pp. 45:15—46:3]. But again, exactly *who* this "man (or woman) behind the curtain" may be, doesn't matter.

This business practice is, by all appearances, the same as State Farm's in *Rutland*—an insurance agent accepted a premium payment which was subsequently reviewed *by someone* and rejected within a reasonable time. Here, Plaintiffs' past-due premium payment was received by Jackson National, endorsed by Jackson National, and deposited by Jackson National, and was subsequently reviewed *by someone* and then rejected because that someone apparently determined that the Policy would not be reinstated. Although the business practices examined by the *Rutland* court are, by comparison to this case, largely obscure, Jackson National's business practices are nonetheless analogous. That is why the issue of *who* made the ultimate decision to deposit the check or *how* the check was deposited is immaterial. The insurance agent in *Rutland*, because of her position, was unable to bind the insurance company to retroactive coverage. *Rutland*, 426 F. App'x at 776. Here, the Court admits that it may certainly be the case that any one of the above-mentioned Jackson National employees had the authority to waive compliance with the Policy's terms when he or she did not stop Plaintiffs' check from deposit. However, as previously stated, the Eleventh Circuit has ostensibly accepted business practices where an insurance company deposits a check and asks questions later. Jackson National, in this case, did just that.

In addition to these similar business practices, *Rutland*'s over-arching principle, that a six-week retention period is not unreasonable and does not constitute a retention, nonetheless applies notwithstanding the factual labyrinth of Jackson National's

operating procedures. 426 F. App'x at 774. Just four short months after the *Rutland*

decision, the United States District Court for the Southern District of Georgia decided

*Boross v. Liberty Life Insurance Company*. No. 4:10–cv–144, 2011 WL 4102524 (S.D. Ga.

Sept. 14, 2011). In *Boross*, the plaintiffs obtained a mortgage loan secured by real

property. *Id.* at *1. In 2002, the insured applied for a mortgage life insurance policy with

Liberty Life Insurance Company, but the plaintiffs ultimately defaulted on their

mortgage loan and the insurance company received their last complete payment on July

1, 2009. *Id.* at *1–2. The insured died on December 14, 2009. *Id.* at *2. A representative

from Liberty told the insured's son that "if [the insured's widow] paid her due balance

of $242.55, Liberty would reinstate [the] policy." *Id.* On December 22, 2009, the insured's

widow sent a check to the insurance company equal to that amount. *Id.* Liberty,

"alleging that the life insurance policy had lapsed due to nonpayment, refused to pay"

the beneficiary. *Id.* at *2.

As a reminder, "if an insurance company receives, accepts, and *retains* past-due

premiums which are paid subsequent to the due date and expiration of the grace

period, it renews the contract and waives the forfeiture for non-payments provided the

acceptance is unconditional and the facts are known." *Id.* at *4 (quoting *Clark*, 404 S.E.2d

at 152). Consistent with Plaintiffs' argument in this case, the insured's widow (in *Boross*)

contended that the insurance company, by "accepting [her] late payment, 'departed

from the strict terms of payment and receipt of policy premiums' and 'revived the

original contract.'" *Id.* at *4. It comes as no surprise that the district court followed and applied *Rutland*'s determination that "an insurance company does not retain payment when it refunds late payments within a reasonable amount of time." *Id.* (citing *Rutland*, 426 F. App'x 771 (11th Cir. 2011)). Applying *Rutland*'s six-week period for "reasonableness," the district court concluded that "[t]hree weeks was not an unreasonably long time for Liberty to evaluate [the] claim and account status." *Id.* at *5.

To be clear, the Court notes Plaintiffs' argument that Georgia law does not limit retention to a time test only. [Doc. 62 at p. 13]. However, their argument "[t]hat another employee down the line later decided not to honor the demand does not mean it was not accepted and retained in the first instance," simply runs afoul of the business practices—by insurance companies—previously accepted by the Eleventh Circuit, the Southern District of Georgia, and now by this Court. [*Id.* at p. 14]. In *Boross*, Liberty appears to have used the same business practices, depositing an outstanding premium payment and someone "down the line" "refunded the [payment] that was meant to reinstate the account." [*Id.*]; *Boross*, 2011 WL 4102524, at *3.

Perhaps, and most likely, all of this is due to Jackson National's internal procedure to endorse incoming checks (like Plaintiffs') for deposit immediately upon their arrival to Jackson National's mailroom without anyone to authoritatively review the status of a policy. Even though no one knows *who*, if anyone, submitted Plaintiffs'

check for deposit, the fact of the matter is that it was indisputably deposited.[14]

Nevertheless, it took Jackson National only five days, upon discovering that Plaintiffs' policy had lapsed and that their check had been deposited, to make its inquiries and initiate a refund to Plaintiffs from around the world in Noida, India. [Doc. 62-1 at ¶¶ 69, 76]. Ultimately, Jackson National initiated a refund within 12 days of receiving Plaintiffs' check, and as devastating as the result may be to Plaintiffs, this simply is not an unreasonable amount of time to constitute a retention sufficient to waive the Policy's terms and reinstate it. Accordingly, the Court **GRANTS** summary judgment to Jackson National as to Plaintiffs' first breach of contract claim.[15]

With regard to Plaintiffs' second breach of contract claim, they contend that when Jackson National temporarily deposited the past-due premium payment, it retroactively renewed, reinstated, and modified the Policy, and waived any alleged policy terms purporting to cancel or lapse the Policy thereby creating a new contract. [Doc. 16 at ¶ 48]. To begin, Jackson National argues that "submission of past-due premium payments can effectuate no more than a continuation of the underlying,

---

[14] Given the ease of depositing checks in today's modern, and nearly fully automated, banking system, it is absolutely possible and conceivable that a company that processes thousands of checks would design a system to deposit checks as quickly as possible. Likewise, the same system also makes it extraordinarily easy to rapidly return any monies should that company determine a refund is necessary.

[15] Even worse for Plaintiffs is that, unlike the plaintiffs in both *Rutland* and *Boross*, no one from Jackson National ever made a representation that upon payment of the outstanding premium their Policy would be reinstated. *See, e.g.*, *Rutland*, 426 F. App'x at 773; *Boross*, 2011 WL 4102524, at *2.

forfeited insurance contract, *if* the insurer retains the delinquent payment." [Doc. 47-1 at

p. 14 (emphasis added) (citing *Merrell*, 184 S.E. at 657)]. Further,

> acceptance of premiums after default does not create a new contract, [it] merely continues the binding effect of the original policy. A contract for the reinstatement of a life policy is not a new contract; rather it is merely a waiver of forfeiture, so that the original policy is restored and made as effective as if no forfeiture had occurred . . . .

*Id.* (citation omitted).

In response to these points, Plaintiffs contend that Jackson National "accepted

[their] offer by reviewing [their letter] from start to finish and then [depositing their]

check." [Doc. 62 at p. 16]. According to Plaintiffs, the evidence shows that their initial

letter constituted an offer to modify or create a new contract and that Jackson National's

even temporary acceptance of their premium payment constituted acceptance of that

offer. [*Id.*]. To bolster that argument, Plaintiffs candidly admit that "payment of past

premiums is generally not treated as a new contract," but instead establishes a waiver

of forfeiture. [*Id.* (citing *Merrell*, 184 S.E. at 657)]. They assert that their initial letter—

given all of its contents—amounts to more than a mere attempt to tender a past-due

payment, but instead should be "viewed as an offer to create a new contract or modify

[the Policy] in exchange for past premiums and other consideration." [*Id.*]. However,

that is where Plaintiffs' argument on this topic ends. Although basic principles of

contract formation are—among those in the legal community—widely known, Plaintiffs

provide no support (absent their citations to Title 13 of the Georgia Code) for why the

Court should view their initial letter as an offer to create a new contact or modify the existing Policy, and the Court is not willing to explore what arguments, if any, may be available to support Plaintiffs' contention. *See* [*id.*].

The Court has already determined that there is no waiver in this case, and absent a waiver, there can be no renewal. Regardless of what Plaintiffs would have argued on the subject, it is clear that their renewal argument fails as a matter of law, because there is no waiver when a defaulting insured sends an outstanding payment to an insurance company and the insurance company does not *retain* that payment. *Merrell*, 184 S.E. at 657. Therefore, the Court **GRANTS** summary judgment to Jackson National as to Plaintiffs' second breach of contract claim.[16]

### C.    Plaintiffs' Accord and Satisfaction Claim (Count III)

In the alternative to Counts I and II, Plaintiffs' third claim rests on the contract theory of accord and satisfaction.[17] Specifically, Plaintiffs claim that: (1) the Trust and

---

[16] Given the Court's ruling on Plaintiffs' breach of contract claims on waiver grounds, the Court need not discuss the parties' argument as to whether Julianna Brannen, as acting trustee or not, was within her authority to contract with Jackson National or modify the terms of the Policy. [Doc. 47-1 at pp. 15–16]; [Doc. 62 at p. 17].

[17] In Georgia,

> [a]ccord and satisfaction occurs where the parties to an agreement, by a subsequent agreement, have satisfied the former agreement, and the latter agreement has been executed. The execution of a new agreement may itself amount to a satisfaction of the former agreement, where it is so expressly agreed by the parties; and, without such agreement, if the new promise is founded on a new consideration, the taking of it is a satisfaction of the former agreement.

O.C.G.A. § 13-4-101.

Jackson National were parties to an agreement (the Policy), (2) that their initial letter constituted a new offer, and (3) that Jackson National reviewed the letter, endorsed, and deposited their check as consideration. [Doc. 16 at ¶ 53]. As for its argument in support of summary judgment, Jackson National argues that because there was no right of action to be satisfied by Plaintiffs' late premium payment, there simply is no agreement between Plaintiffs and Jackson National. [Doc. 47-1 at ¶ 17].

Plaintiffs, on the other hand, assert that their initial letter "sought resolution [for] all [of their] claims against Jackson [National] in exchange for acceptance of past premiums." [Doc. 62 at p. 18]. Plaintiffs' prior counsel's letter stated that if Jackson National denied Plaintiffs' demand for full payment of the Policy amount, they would be prepared to litigate the issue of whether Jackson National properly notified Maggard, the then-trustee and owner of the Policy. [*Id.*]; [Doc. 55-1 at p. 2]. Building their accord and satisfaction claim on the contents of this letter, Plaintiffs argue that "[i]n exchange for forgoing litigation, . . . and paying [past-due] premiums, [they] sought reinstatement." [Doc. 62 at p. 18]. Thus, because Jackson National, with "an unobstructed view of the facts" deposited their check, Plaintiffs believe there is a triable issue as to this claim. [*Id.* at pp. 18–19].

Under Georgia law, "[a]n accord . . . is an agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other." *S. Pilot Ins. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1258 (N.D. Ga. 2014) (citing

*Withington v. Valuation, Inc.*, 547 S.E.2d 594, 596 (Ga. Ct. App. 2001)); *see also* [Doc. 47-1 at p. 17]. Satisfaction is the discharge of an obligation by performance of said agreement. *See Waters v. Lanier*, 157 S.E.2d 769, 799 (Ga. Ct. App. 1967). Thus, "there must be a bona fide dispute between the parties that necessitated the accord and satisfaction in the first place." *CECS*, 52 F. Supp. 3d at 1260 (citing *Rafizadehk v. KR Snellville, LLC*, 634 S.E.2d 406, 408–09 (Ga. Ct. App. 2006) (holding that for accord and satisfaction to apply, "th[e] dispute must be bona fide, meaning that both parties must have understood and been aware that the dispute existed prior to the tender of the reduced payment")).

Here, there is no evidence that there was a bona fide dispute between the parties until Jackson National rejected Plaintiffs' claim *after* they submitted their premium payment—as in, the payment could not have been submitted in satisfaction of any dispute since it was paid *before* the dispute arose. Plaintiffs created the dispute by issuing their payment instead of issuing a payment to resolve a dispute. *See id.* (holding that a party is unable to recover under an accord and satisfaction theory when he or she "essentially created the controversy by demanding reinstatement with [a] tender letter").

Moreover, this contract-law theory, in order to be rendered valid, requires a meeting of the minds. *Id.* at 1258; *accord Lumsden v. Williams*, 704 S.E.2d 458, 464 (Ga. Ct. App. 2010) ("An accord and satisfaction is a separate agreement and thus must meet the

requirements for forming a contract."). Upon the delivery of Plaintiffs' initial letter and check, no reasonable jury could find that there was a meeting of the minds between them and Jackson National. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted."). There was no life insurance policy in existence at the time Plaintiffs tendered payment because they failed to pay the premium while the Insured was still living.[18] Lastly, nine days after Jackson National deposited Plaintiffs' check, their prior counsel even sent an email to Jackson National's customer service center stating that "neither [he] nor [Plaintiffs had] received a response" to the initial letter. [Doc. 62-1 at ¶¶ 75, 80]; [Doc. 47-1 at p. 19]. This makes it palpable that not even Plaintiffs could suggest that a meeting of the minds had occurred. Accordingly, the Court **GRANTS** summary judgment to Jackson National as to Plaintiffs' accord and satisfaction claim.

      **D.**     **Plaintiffs' Bad-Faith Damages Claim**

Plaintiffs, on the belief that Jackson National "did not have reasonable and probable cause to deny [Plaintiffs'] demand," claim that Jackson National acted in bad

---

[18] "Coverage for an event that has already occurred contravenes the very definition of insurance." *Rutland*, 426 F. App'x at 776.

faith.[19] [Doc. 16 at ¶ 73]. As both parties correctly argue, "[b]ad faith is shown by evidence that under the terms of the policy under which the demand is made and under the facts surrounding the response to that demand, the insurer had no 'good cause' for resisting and delaying payment." *Lawyers Title Ins. v. Griffin*, 691 S.E.2d 633, 637 (Ga. Ct. App. 2010) (citations omitted) (emphasis omitted); *see also* [Doc. 47-1 at p. 20]; [Doc. 62 at p. 19]. However, bad-faith penalties will not be assessed "where [an] insurance company has any reasonable ground to contest the claim . . . ." *Griffin*, 691 S.E.2d at 637.

In this case, the Court has found ample reasons permitting Jackson National's denial of Plaintiffs' demand. Sensibly, Plaintiffs' bad-faith claim is derivative of their breach of contract and accord and satisfaction claims. Therefore, a claim of bad faith cannot exist in absence of these other claims. *See* Sections II(B) and (C), *supra*. The Court has determined that Jackson National's actions did not constitute a retention sufficient to establish a waiver reinstating the Policy. Thus, it follows that there can be no bad faith claim under this statute, and the Court **GRANTS** Jackson National's summary judgment motion as to Plaintiffs' bad-faith claim.

---

[19] "To prevail on a claim for an insurer's bad faith under O.C.G.A. § 33-4-6," Plaintiffs "must prove: (1) that the claim is covered under the policy, (2) that a demand for payment was made against [Jackson National] within 60 days prior to filing suit, and (3) that [Jackson National's] failure to pay was motivated by bad faith." *Lawyers Title Ins. v. Griffin*, 691 S.E.2d 633, 637 (Ga. Ct. App. 2010) (citation omitted); O.C.G.A. § 33-4-6; [Doc. 16 at ¶ 71].

### III.  CONCLUSION

In light of the foregoing, the Court **GRANTS** Jackson National Life Insurance

Company's Motion for Summary Judgment [Doc. 47]. This case is **DISMISSED**.

**SO ORDERED**, this 16th day of September, 2019.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**